25-3586 Logan Houle v. City of Marion OH Police Dept, et al. Oral argument, 15 minutes per side. Mr. Sebecki for the appellant. May it please the court and please counsel, I'd like to reserve 3 minutes for rebuttal. I represent the appellant and his name is Mr. Houle. This is a police misconduct case involving excessive force brought under the 4th Amendment through 42 U.S.C. section 1983. My plan in the next few minutes is to go through 4 different areas of the case that I briefed and emphasize some points maybe that I did not emphasize or I unduly emphasized in the brief. And they are the 4 areas briefly is the summary judgment standard. I maintain there are issues of material fact that as a result there should not have been a summary judgment. I will talk about the Graham factors, the 3 factors under the U.S. Supreme Court case of Graham. I will talk about the immunity being claimed by the other side. And I'll touch on the issue of expert testimony. Let's get going. On the Rule 56 summary judgment standard, there is, and this is very important to my appeal, there is a genuine dispute of material fact. About when he applies pressure? Exactly. Allow me to read 2 sentences from the affidavit which is in the record by the appellant. Lieutenant Muzzer grabbed my t-shirt and Officer May grabbed me and slammed me to the ground. As I hit the ground, Officer May immediately started to choke me. That's a fact-based affidavit, that portion of the affidavit. I understand the trial court took out some areas and didn't explicitly say which areas it was taken out. But this points out that there is a material issue of fact in this case that touches upon the other 3 matters including the Graham matters. I mean, it's undisputed that the officer has his elbow around the client's neck area. I mean, is that, is what you just recited precise enough to say, okay, it amounts to a choke hold? Is that, is used as sort of a term of art? Choke hold is a deadly use of deadly force, given that the officer, Officer May, talks about in his testimony that he had his arm around the appellant's neck. But he makes it very clear he wasn't using any force, wasn't pressing on his throat to deprive him of oxygen. But he was, and he fully admits it, that he did use deadly force, the choke hold. The choke hold is the use of deadly force. After, you know, the guy reaches for the weapon. That's right, exactly. And that's in the record. But it's important, we're talking about deadly force. The longer you use deadly force, there's a bigger chance that the person will die as a result of deprivation of oxygen. And if you look at it from my client's viewpoint, the deadly force took much longer, the choke hold, than it did if you look at May's viewpoint. So it's critical to the case. Let me talk about the Graham. The factual controversy that you're relying on here is that the officer says, and you quote it exactly at page 22 of your brief, which says, well, I then applied pressure and began to squeeze after he grabbed my firearm. The affidavit says, May choked me with a lethal force choke hold for the entire two minutes and 24 seconds as soon as I hit the ground. I mean, isn't that really the crux of the case of whether we credit one side or the other or whether it's a genuine issue of material fact? Exactly, Your Honor. I cannot dispute that. Let me even be more blunt about it. If I'm unsuccessful in my urging this court to accept the fact that there's a material issue of very critical fact here, I lose. Because the Graham factors come into play here. And let me talk about the Graham factors for a moment. Quickly, those are the factors involving, one, the severity of the crime at issue, two, whether the suspect poses an immediate threat to the safety of the officers or others, and three, whether he is actively resisting arrest or attempting to evade arrest. And I went fast because we all know those are the three factors. And let me talk to them as they apply in this case. And I want to acknowledge also the radio call that caused the police to come to the home in the first place. I'm not afraid to say what it is. It's a fact. Their call was a male in an apartment with a knife threatening to kill people. That's obviously a very serious matter. But that quickly went away once the officers came to the scene. I think it was Jagger was the first officer who arrived at the scene. She did a pat-down search, found no weapons on the appellant. And then the other two officers quickly arrived thereafter, and they did a search of the home. And they found nothing unusual. Let me go over the second about the threat to officers or others because, as I understand it, and I take it your position, is he did, quote, attempt to flee. The question of how far he got and what he was doing or where he was going, I take it, do you have a view other than he, quote, was attempted to flee so that if they had not stopped him, he would have gone somewhere. It wouldn't have been the end of the world because it was clear there was no serious crime committed once the search. No, but I just want to get the facts of what was happening here. They're outside the apartment. I take it in some apron area or parking lot. So he might have gone elsewhere, but he would have been in his shorts and whatever. And I'm not criticizing the police for stopping him from fleeing, but I am criticizing the police, specifically me, on using the deadly choke holder immediately. He shouldn't have done that. And it's not like, oh, he shouldn't have done that. So from your point of view, if he's right and if they could have used deadly force, they could have shot him. That is correct. I mean, if we're taking that view of the law. But at the same time, I mean, you would have to admit that, I mean, there are different kinds of, I mean, different degrees of force fall within what we call deadly. And I mean, this, the force applied here is not deadly in the same sense or to the same degree as, say, you know, there was another case where an officer shot a fleeing suspect three times in the back and killed him. I mean, this is not as severe, so to speak, a deadly force as that, right? I respectfully disagree, sir. And even the trial, the district court judge, he put in a footnote in his opinion, the department, police department in this particular municipality, they don't even put, they don't allow deadly force anymore. And it's recognized that a choke hold, they don't allow, excuse me, they don't allow choke holds anymore because it is deadly force. Well, I mean, but as a practical matter, like emptying a full clip, you know, a nine millimeter clip into a suspect is going to kill them more often than doing a choke hold for some period of time that's not, you know, ridiculous. Well, time is important, Your Honor. If you do a choke hold on somebody for just less than a minute, you're probably not going to kill the guy. But if you do a choke hold for more than two minutes, you very likely can kill the guy. I'm happy to report that my client did not die in this situation, but that was a serious matter. Thank the good Lord that he didn't die. Well, he was, you know... He died in a... Go ahead, Judge Seiler. I'm sorry. Was your client tried for this offense or did he just... I was not involved, but my understanding of reviewing the case is he did face a trial in criminal court and he's in prison right now. That's in the record. What impact does that have on this civil case? I don't think that's a factor in the civil case. I took the case knowing that he had been convicted of a crime. But my point is you can't use the deadly force of a choke hold on someone that... It's not necessary to do it. It was only necessary to do it, Your Honor, when he went for the gun. But prior to that time, Officer May had no business using choke hold, deadly force choke hold. I do disagree with Your Honor Keithledge that there's a difference between shooting someone or strangling him around the neck. It is the most extreme use of force by the police. Many police departments, including this police department now, doesn't teach the officers to use the choke hold. And it's very unfortunate and inappropriate and was illegal, violation of the Fourth Amendment, to use the choke hold as soon as he took the guy down. It was a period of time before he went for the gun holster and the gun of the officer. The Graham factors come into play here, and we look at the totality of the circumstances as Graham dictates. My first reaction to this case was similar to what Judge Seiler just mentioned, which is, you know, how is it that there's not some sort of issue, preclusion or something here? And when I look at, I guess, the record from the criminal case, to the extent we have that here, I mean, it does seem like the fact question that you're pointing to was actually litigated in the context of a jury instruction that your client sought in that case, about it related to, I think, an affirmative defense or something. But the Ohio Court of Appeals, in affirming the trial court's refusal to make that instruction, I mean, whether it had an adequate basis or not, specifically made a finding that this pressure was not applied before your client reached for the officer's weapon. And so, in other words, agreed with the defendant's position in this case. I mean, I know that issue has not been argued, I guess, by your friend on the other side, but I'm just wondering why shouldn't your client be precluded from, you know, relitigating this in this case? Even someone in prison for a crime that he committed should still, as this man, as my client has done, be able to bring a civil rights action under 42 U.S. in 1983 regarding the use of the chokehold. He did go to the hospital. I mean, I'm not saying necessarily that all the premises I laid out are correct, but if, in fact, your client litigated this very fact question already and lost, usually you're not going to be able to do it again in another proceeding. That was not entirely mitigated or explained in the criminal trial. I was not involved. All we have is the record of the criminal trial. But that's the criminal case. We have a different jury in a civil case in a civil proceeding. 42 U.S.C. in 1983 allows for a separate trial when you have a constitutional violation. Right, but, you know, there's still issue preclusion in 1983 cases. But anyway, I just want to. Excuse me, Your Honor, go ahead. No, I'm sorry. I didn't mean to talk over you, sir. Go ahead. I apologize, too. You don't have to apologize. Well, usually, you know, I mean, issue preclusion applies in 1983 cases like in any case. But anyway. Now, another concern I guess I had with your position is that it's your obligation in a qualified immunity case to point to another case that not only cites the relevant rule, but has facts similar enough so that the officer would know on the facts, you know, he's facing at the time, hey, I can't do this. And I didn't really see anything in your brief, and please correct me if I'm not remembering, that was really factually similar to this. And so is your argument that, oh, it's just sort of obvious that you can't, like, start doing a choke hold on this person? Well, I do have a case. I probably was not explicit enough in my reply brief. And the case I'm talking about is Coley v. Lucas County. I did cite it in the briefing. 799, excuse me, let me not go so fast, 799 F3D 530. It's a Sixth Circuit case, 2015. This incident that brings us here today happened six years later in 2021. And that was, now, there was an Eighth Amendment case because it was in a prison. As we all know, that would be Eighth Amendment. But that's not, that doesn't mean anything for the reasons I'm using the case. I mean, what were the facts there again, real quick? A prisoner was attacked by a guard. And the court stated in its ruling that, quote, the use of a choke hold on an unresisting and even an initially resistant detainee violates the 14th Amendment. So in that case, the Coley case, there was an indication that the prisoner used the word, squirmed around and struggled. Yeah. Just like my client squirmed around. He was definitely struggling. And struggling. He was not contributing to a good resolution. There were all three officers around. Just in the case I cited from 2015, there were prison guards around. Just as in my case, there were about three officers around. Okay. I think there's a lot. You did a good job answering my question. So we're in the red. We should hear from your friend on the other side, and you'll have your rebuttal. Thank you, Your Honor. Good morning. Morning. Please, the court. My name is Kaitlin Madigan, and I'm here on behalf of the Marion Appellees in this case. This is a case where Officer Justin May for the Marion Police Department was forced to make the difficult but necessary choice to apply deadly force to protect himself, his fellow officers, and the appellant. So when should we, you know, for purposes of a decision, deem that force to have begun in this appeal? So what appellant is suggesting is that there's a genuine issue of material facts based on the affidavit versus Officer May's testimony. We have three separate arguments as to why that wouldn't be a genuine issue of material fact under Rule 56. First of all is that the trial testimony by Officer May somewhat suggests where this discrepancy might be coming from. Officer May, in his trial testimony, stated that when he immediately tried to apprehend the appellant when he was fleeing, that he did what police officers do, which is grab a hold of whatever he can, which in this circumstance happened to be his head. Right. But that his testimony was that it wasn't until after that his weapon was Do we have to credit that testimony? I think it explains the difference between those two things. It would if we credit it, but...  And Judge Carr, in his opinion, somewhat strangely to me at least, says, well, I credit the credible testimony of the officers without really addressing the contradiction. Right. And I think that the court, under these circumstances, has the ability to review what this evidence was and what these facts are that... Sorry, the court meaning the district court? The district court, I apologize, yes. So I'll call them to district court the trial. Okay, now that's fine. So in this circumstance we had, it's not merely appellant versus Officer May. It's appellant versus Officer May and the other two officers who are testifying as to the same. The other two couldn't have... They don't testify to how much pressure was being applied at what moment, do they? They testify as to... So we have Officer May's testimony as to when he was applying the force, but we have the other two officers witnessing when the gun was trying to be apprehended. So when Officer... Everybody seems to agree... Well, Mr. Houle doesn't agree that he even tried to grab it, but that sort of thing we need to take from the officer's perspective. He felt that. But focusing on that 90 second or so period between taking him to the ground and the alleged grab of the gun and say, okay, from then forward the officers could use deadly force. Do you have an argument that if we believe the affidavit that he was being choked for the first 90 seconds, what argument do you have? We have this testimony of the other two officers. I think it's important to consider, and we talked about the Carnahan case in our briefing, it's important to consider what the district court was looking at here. We have appellant saying that it was immediate and the other three officers saying that it wasn't. It's not like we don't put it up for a vote under Rule 56. A jury could choose to disbelieve all three officers and think, oh, they're just trying to help each other out. I mean, we don't find facts here when there's competing testimony. I think that's what... So I think Judge Boggs is asking if we do, in fact, for our purposes, take Houle's testimony as true, that this pressure starts as soon as he gets him on the ground. Do you have an argument based on that assumption as to why you should win? Carnahan was similar. I'm sorry? Carnahan, the case that we cited that was also an excessive force case, was similar. There were three eyewitnesses competing against the officer's testimony. What the court found in Carnahan was two of those witnesses were not in a position where they could see what was going on. And, in fact, their testimony had mostly to do with what they could see from the arms that were moving. The third witness was giving, in essence, opinion testimony as to what excessive force is. And in Carnahan, they looked at those three eyewitnesses and said, well, this testimony doesn't actually give us conflicting facts because they weren't able to observe what was going on. This is similar. Which way did that come out? It came out in favor of the police department in that case. You're saying that because we don't know what happened, the officers win? Well, the officers were in close proximity and were able to testify as to what was going on. The eyewitnesses weren't able to see. Just reprise for me what you said the other two officers testified to about the neck pressure. Yeah, and I think this is significant. So at the time that May, or even the appellant, is asserting that pressure was asserted, the officers and the appellant were in a specific position. Appellant's on the ground. May's on appellant. Musser is behind May. So is Jagger. Jagger and Musser have a very good view of what's going on. Appellant is on the ground. This sounds like a jury argument. No. What do they actually say when you say they have a good view? Do they say he's not choking him? No. Musser says, gun, gun, he's got the gun. Well, but that's, wait a minute, gun, gun, that's after the 90 seconds. That's the end of it. So all of that, at least for the moment, they're not pushing, and we've both been asking you during the 90 seconds, what's the controversy? During the 90 seconds, the testimony doesn't support that May has a hold of his head. And during this time, appellant's struggling. He was tased multiple times. He was maced. He wasn't maced until after the gun, is my memory. Yeah, so he was maced after. In other words, there is an ongoing struggle. There's no question about that. But the issue is, is it okay, is it reasonable to use deadly force from the beginning of the encounter? I mean, we can get into the Graham factors later on, but it seems to me you're arguing facts here about the whole struggle and say this guy is acting like an SOB during the whole time, but that's not a constitutional defense. And I think the Supreme Court last year in Barnes addressed that, that we can't look at these factual determinations under Graham in a vacuum, that we have to look at the entire scope of the facts, both preceding and following. If we look at perhaps the third Graham factor following this encounter, following the application of deadly force, appellant continued to struggle. Well, let me ask you, maybe put the question this way. All right, so there's a period, two and a half minutes or whatever, when the officer has pool on the ground, right?  Was the officer, could the officer use deadly force from the outset of that two and a half minute period without liability in this case, like right from the get-go? So looking at the Graham factors, we have to also kind of consider what happened before he tried to flee. Sure. We have the threats of a knife. Right. We have a scene that has not been released. While the tone has been cleared, the investigation has not been concluded. The parties are, they haven't interviewed witnesses. They haven't figured out exactly what's happened. And the officers are considering the possibility that now we have somebody who is acting erratically. All the officers testified as to the possibility he could have been on drugs. He was resisting the taser. He had pinpoint pupils that were fixed. He was pacing. He was balling his fists. He was shouting expletives. So what do you think? We're looking at someone who's been- So what authority would, I mean, I don't know, do you, could they have shot him as he was fleeing? In terms of if we- Is there authority that would support that or at least make that kind of, you know, something that's not obvious? Right. If we look at the Graham factors, severity of the crime, potentially violent crime, if we look at the resisting arrest, he's running away, yes, arguably they would all apply to those circumstances leading up to the investigative detention. We're still dealing with a dangerous situation that hasn't been rectified by the police yet. In fact, all of the officers instructed him not to go back into the apartment where they did find a knife on the counter because they were afraid that he was going to reaccess a weapon if, in fact, he was the person. How big was that knife? Pardon me? How big was the knife? It's not on the record. It's described as, quote, a kitchen knife in the kitchen. Right. Are we talking like, you know, a butcher knife kind of deal or- Not on the record. We don't know. We don't know. The record just says a kitchen knife. And the shouting expletives. I was looking at Carr's opinion. I didn't notice that. When was that happening? That happened after Officer Jaeger arrived at the scene. He was shouting at the women in the apartment. Oh, calling the women names. Right, yes. Not the officers. He seemed to be back and forth with, do you want to shake hands with me or do you not want to shake hands? Right, but his behavior was very unpredictable. Okay, but, you know, if he had gotten away from them 5, 10 feet, would they have been entitled to chase him and use deadly force? Well, that's what happened here. They did chase him, yeah. But not very far. I mean, he was in sort of contact, right? Right. And what we're looking at isn't, you know, what would have happened. What we're looking at is what did happen in this case and whether there's a genuine murder. And according to your side, he was not, quote, under arrest. He was never told he was, but he was not under arrest until they took him down. He was not under arrest until he began to flee. He was under arrest. He was not under arrest while he's standing there, but as soon as he starts to walk away or run away, he's then under arrest even though he's not told. You know, usually stop in the name of the law. The facts here are significant. Lieutenant Musser thought it was appropriate to put him under an investigative detention at that time. Cherry stop. Right, based on his behavior. Tell him that, but okay. Right, and he didn't have an opportunity to. He had just reached for his cuffs on his duty belt when Appellant fled, and that's when the entire altercation began. I think it's also important to note that if we're looking at the affidavit, paragraph 15 of that affidavit for plaintiff, sorry, Appellant, is where he's making that assertion as to the immediacy of the chokehold. We filed as part of our reply of our motion for summary judgment, a motion to strike, and that motion to strike enumerated specific paragraphs in the affidavit that we thought were either inadmissible hearsay or unsupported legal conclusions. Paragraph 15 was one of those. And that motion was not opposed. That motion was?  And in the trial court's, sorry, the district court's ruling, there's a footnote where it says that it's not going to be considering any unsupported legal conclusions. However, in pages 1 and 2, kind of at that little bottom section, it talks about how it's going to take the factual assertions as true. So it's fair to assume that paragraph was stricken for consideration based on our motion to strike, and never comes into the factual record at all. Which paragraph again are we talking about here? Paragraph 15 of the affidavit. So your argument is that Judge Carr struck that paragraph from the affidavit? Correct. That's certainly what the ruling seems to suggest. Seems to suggest. Okay, we can go back. Judge Seiler, do you have any questions you want to ask? I'm going to ask something that jumps up at me is how often does this sort of thing come about? Do you have a good case? Because what we're doing is an arrest of a person, and he gets convicted, and he's in prison, and he filed suit against the authorities who arrested him and the circumstances of that. I would think if there are other cases about that, we might be citing them, but I don't really see anything like this much. Not after the fact. And I believe the court asked the question about collateral estoppel. We raised that on summary judgment. The district court didn't rule on it. Well, let me give you the example because it connects to this. Maybe because I wrote it, I love it. It's an old case called Brandenburg v. Curitan. There's a guy up in the hills of Kentucky, and the officers come up and roust him, and he doesn't want to come out. They retreat. He comes down the road, country road, and he's got a rifle, and the officers shoot him dead. And we held there was evidence that he had the rifle up, and there was evidence that he never raised the rifle. And we said, genuine issue of material fact. I don't know if you agree or disagree, but it's a published opinion. Now, suppose they didn't kill him and they just shot him and take him to trial, and he's convicted of menacing the officers. So would you say that's collateral estoppel issue preclusion? Yes. That was precisely the argument we raised. So that by charging him criminally and taking him to a criminal jury, you win the civil case. In essence. So the facts. I mean, it's interesting. Any cases for that you can think of? We raised a number in our summary judgment but not on appeal. So the district court stated in its opinion it was taking notice of the facts that were in the criminal trial. And certainly those facts and the legal finding that there was a legal detention, a legal arrest in this case, would apply here to negate the excessive force arguments under the fourth. Well, even if the detention was lawful and the, quote, arrest was lawful, if they say you're under arrest and jump him, can they then use deadly force? If the arrest was lawful but he's not. I suppose we would need some, in order to. In other words, you can use deadly force as soon as you say somebody's under arrest. No. That's not what the gram factors say. Yeah. And here we're looking at the gram factors in terms of the severity of the threat that he was posing both to the officers and the public. But that threat was not severe enough even to put him under arrest before he flees, right? True. And so you have, I mean, even with the phone report and everything, you have a situation where at the moment he flees, there's nothing serious enough here even to put this person under arrest. And now he's resisting or fleeing and he can go right to deadly force? So if I understand the question correctly, we're looking at the moment of arrest being the moment that deadly force can also be applied? Well, I'm just saying, you know, before he flees, there's not even grounds to seize him. I mean, he's not under arrest and, you know, he's unarmed. And I haven't heard, I mean, I don't understand you to have argued that they could have put him under arrest right before he takes off. No, but they could put him under an investigative detention, which is what they were. I guess my point is that the fact that he was not subject to arrest when he flees speaks to his dangerousness as well. And so, I mean, he's not dangerous enough to arrest. And now you add whatever you had, you know, he's not that dangerous. You add the fact that he flees and now, you know, you can kill him. You know, you could you could fire at him because now he's that dangerous under Tennessee v. Garner. Correct. I mean, at the moment of the flee is when this becomes a far more serious situation. The investigative detention was only so that the officers could complete the investigation to determine where the risk was. They hadn't had an opportunity to do that at the time that he fled. He was potentially a threat to the public. OK. Gene, Judge Saller, did you have any further questions? Oh, thank you. Thank you. No, I'm good. OK. I'm over my time. All right. Thank you very much for your argument. And we'll hear rebuttal. I want to take this opportunity, Your Honors. I made one minor mistake. I say minor. Every mistake is. I made one mistake in my brief. I discovered it two days ago. I want to bring it to the attention of the court. I think it's a minor mistake. It doesn't change anything. I refer you to my reply brief, page nine, footnote one. And I indicated May's trial testimony establishes so on and so forth. It was Muzer I was quoting, not me. OK, got it. And again, I repeat myself, page nine, footnote one of my brief. I just want it was important to me that I make that correction. Now, let's talk about the grand factors for a moment. The kitchen. I'm going to pick up where you were at, Judge Boggs. Not only was it a kitchen knife and not only was it in the kitchen, but it was in the proper place in the kitchen by the cutting board. If I recall the facts, facts of the case. And there was no indication in the rest of the apartment that there was any damage. No furniture was up, overturned. The two women that were there. No, they were not nervous. They wouldn't do not exhibit any injuries. There were no injuries. It fits nicely into the grand formula that deadly force should not be used in this situation. With all due respect, Ms. Madigan, with total respect, I'm glad you're not the police chief where you would allow people to be shot when they're running away in a minor matter. I want to address the last issue, expert testimony. That's a question that I would ask this case be sent back on remand to the district court for trial and that the judge then, whoever is assigned to the case, that the judge be allowed to explore the Daubert factors and that be briefed by counsel before the jury trial to determine if the expert testimony should come in or not. I welcome any further questions. Well, I mean, the problem there was there wasn't a Rule 16. Yeah, it's a civil case. Rule 16 disclosure, right? I mean, you have . . . and I know you weren't the lawyer in the district court, but there are disclosure rules in the rules of civil procedure, as I'm sure you know. One of them requires . . . basically, you have to do an expert report under Rule 16 and let the other side see all of the opinions that the expert is going to offer. That didn't happen, which is a layup for the district court to exclude it, unless I'm missing something. That did not happen, but my reading on Daubert . . . Well, I see what you're saying. You don't even get to Daubert. I mean, you have to do the disclosure first. Then, if you do the disclosure, then the other side could say, you know, this expert doesn't have a sufficient basis for his opinion. It's junk. Then you talk about the merits of whether there's a sufficient basis for the opinion, but you don't get there unless you do a disclosure. Can I condone there was no disclosure? I was not involved. Yeah. I mean, district court . . . I mean, given the absence of disclosure, I don't think there's really any argument that the district court abused its discretion in saying, you can't just spring this witness on the other side for any purpose. The fact that in the later proceedings, the judge did qualify the expert witness as an expert in the suppression hearing. If you recall, Your Honor, there was a suppression hearing . . . In a criminal case we're talking about? In the criminal case. Yeah, but the problem is, I don't think this is that fruitful. The problem is, he was not disclosed as a witness. There was no expert report provided to the other side under Rule 16 in this civil case, and that is just a rock-solid basis for the district court to exclude him. Yes, sir. I would ask, based on our other issues, that the case be remanded back to the district court for a trial in this matter. Thank you.  Well, thank you both for your arguments. The case will be submitted.